**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| JAMES CLEM, Derivatively on Behalf of WALGREENS BOOTS ALLIANCE, INC., <br><br> Plaintiff, <br> v. <br><br> JAMES A. SKINNER, STEFANO PESSINA, WILLIAM C. FOOTE, NANCY M. SCHLICHTING, GINGER L. GRAHAM, DAVID J. BRAILER, JANICE M. BABIAK, DOMINIC P. MURPHY, JOHN A. LEDERER, JOSÉ E. ALMEIDA, GEORGE R. FAIRWEATHER, and LEONARD D. SCHAEFFER, <br><br> Defendants, <br> -and- <br><br> WALGREENS BOOTS ALLIANCE, INC., a Delaware corporation, <br><br> Nominal Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

Case No. 1:21-cv-00406-LPS

REDACTED VERSION OF D.I. 2 FILED ON APRIL 2, 2021

DEMAND FOR JURY TRIAL

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR**
**BREACH OF FIDUCIARY DUTY AND VIOLATION OF SECURITIES LAW**

Plaintiff, by his attorneys, submits this Verified Stockholder Derivative Complaint for Breach of Fiduciary Duty and Unjust Enrichment. Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff which are based on personal knowledge. This complaint is also based on the investigation of plaintiff's counsel, which included, among other things, a review of documents obtained pursuant to 8 *Del. C.* §220 (the "Section 220 Documents"), a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a stockholder derivative action brought by plaintiff on behalf of nominal defendant Walgreens Boots Alliance, Inc. ("Walgreens" or the "Company") against certain of its officers and directors for breach of fiduciary duty and violation of securities law.  These wrongs resulted in hundreds of millions of dollars in damages to Walgreens' reputation, goodwill, and standing in the business community.  Moreover, these actions have exposed the Company to hundreds of millions of dollars in potential liability for violations of state and federal law.

2.      In particular, this action seek redress for the Individual Defendants' (as defined herein) wrongdoing concerning the Company's now-failed merger with Rite Aid Corporation ("Rite Aid").  On October 27, 2015, Walgreens announced it had agreed to acquire Rite Aid.  The proposed transaction would combine two of the three largest drug store chains in the U.S.  As such, analysts and reporters suspected that antitrust regulators, specifically the Federal Trade Commission ("FTC"), would not allow the merger due to the threats it foreseeably posed to competition.  These suspicions proved valid despite the Individual Defendants' public assurances to the contrary.  The FTC had indicated geographic areas of anticompetitive concern and had not approved the merger by its original end date of October 27, 2016, signaling regulatory approval of the merger was in doubt.

3.      Despite knowledge that the merger was in jeopardy, the Individual Defendants failed to soften their confident stance to investors.  From October 20, 2016 to June 28, 2017, these fiduciaries made or allowed Walgreens to make a series of improper statements continuing to assure investors they were confident the deal would close while dispelling outside reports signaling regulatory turbulence.  The Individual Defendants backed these assurances by alluding to inside knowledge of the FTC's review process and noting their close collaboration with the agency.  They

further asserted their confidence in the deal's closing had not changed since the beginning. ███

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

4.      On June 29, 2017, the Company shocked the market as it revealed that it had terminated the merger agreement, which had been revised and amended several times as a consequence of regulatory delays.  Instead, Walgreens announced that it had entered into an asset purchase agreement with Rite Aid pursuant to which it would simply acquire 2,186 stores, three distribution centers, and related inventory from Rite Aid.  As a direct result of the improper statements detailed herein, Walgreens is now the subject of two federal securities class action lawsuits.  As discussed more fully below, the courts have (twice) denied the defendants' motion to dismiss one of these actions.  Both actions are currently pending.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction under 28 U.S.C. §1331 because the claims asserted herein arise under section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §78n(a)).  This Court has exclusive subject matter jurisdiction over the federal securities law claims under section 27 of the Exchange Act (15 U.S.C. §78aa) and supplemental jurisdiction over the state law claims asserted herein under 28 U.S.C. §1367.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise lack.

6.      This Court has jurisdiction over each defendant because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual

---

█ ████████████████████████████████████████████████████
████████████████████████████████████

who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

7.    Venue is proper in this Court under 28 U.S.C. §1391(a) because: (i) Walgreens is incorporated in this District; (ii) a substantial portion of the transactions and wrongs complained of herein, including defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iii) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District

## THE PARTIES

**Plaintiff**

8.    Plaintiff James Clem was a stockholder of Walgreens at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Walgreens stockholder.

**Nominal Defendant**

9.    Nominal defendant Walgreens is a Delaware corporation with principal executive offices located at 108 Wilmot Road, Deerfield, Illinois.  Walgreens is a pharmacy-led health and wellbeing enterprise with locations across the U.S. and Europe.  Walgreens operates a global pharmaceutical distribution network and is a large purchaser of prescription drugs and many other health and wellbeing products.  As of August 31, 2020, the Company had approximately 321,000 employees.

**Defendants**

10.    Defendant James A. Skinner ("Skinner") is a Walgreens director and has been since July 2005.  Defendant Skinner was also Walgreens' Executive Chairman of the Board of Directors (the "Board") from January 2015 to March 15, 2021 and Non-Executive Chairman of the Board

from July 2012 to January 2015.  Defendant Skinner knowingly, recklessly, or with gross negligence caused or allowed Walgreens to: (i) operate with inadequate internal controls; and (ii) make improper statements in its press releases and public filings concerning the regulatory risks faced by the Company's now-failed merger with Rite Aid.  Walgreens paid defendant Skinner the following compensation as an executive:

| Year | Salary | Stock Awards | All Other Compensation | Total |
|------|--------|--------------|------------------------|-------|
| 2019 | - | $9,398,557 | | $9,398,557 |
| 2018 | - | $6,229,183 | - | $6,229,183 |
| 2017 | - | $7,111,185 | - | $7,111,185 |
| 2016 | - | $6,031,651 | $341,450 | $6,373,101 |
| 2015 | $137,958 | $5,175,015 | $167,454 | $5,480,427 |

11.    Defendant Stefano Pessina ("Pessina") is Walgreens' Executive Chairman of the Board and has been since March 15, 2021, and a director and has been since August 2012. Defendant Pessina was also Walgreens' Chief Executive Officer ("CEO") from July 2015 to March 15, 2021; Executive Vice Chairman of the Board from January 2015 to March 15, 2021; Acting CEO from January 2015 to July 2015, and Executive Chairman of the board of directors of Alliance Boots GmbH ("Alliance Boots") from July 2007 to December 2014.  Defendant Pessina is named as a defendant in a related securities class action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act.  Defendant Pessina knowingly, recklessly, or with gross negligence caused or allowed Walgreens to: (i) operate with inadequate internal controls; and (ii) make improper statements in its press releases and public filings concerning the regulatory risks faced by the Company's now-failed merger with Rite Aid.  Walgreens paid defendant Pessina the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | All Other Compensation | Total |
|------|--------|--------------|---------------|------------------------|-------|
| 2019 | - | $13,158,012 | $5,969,372 | $28,818 | $19,156,202 |
| 2018 | - | $6,229,183 | $7,202,212 | $71,545 | $13,502,940 |
| 2017 | - | $7,111,185 | $7,361,500 | $201,137 | $14,673,822 |
| 2016 | - | $5,017,137 | $4,984,416 | $138,815 | $10,140,368 |

| 2015 | $35,850 | $7,000,006 | - | $97,299 | $7,133,155 |

12.     Defendant William C. Foote ("Foote") is Walgreens' Lead Independent Director and has been since January 2015 and a director and has been since January 1997.  Defendant Foote knowingly, in bad faith, or in conscious disregard for his duties caused or allowed Walgreens to: (i) operate with inadequate internal controls; and (ii) make improper statements in its press releases and public filings concerning the regulatory risks faced by the Company's now-failed merger with Rite Aid.  Walgreens paid defendant Foote the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2019 | $160,000 | $200,000 | - | $360,000 |
| 2018 | $160,000 | $200,000 | $80,479 | $440,479 |
| 2017 | $155,000 | $190,000 | $69,860 | $414,860 |
| 2016 | $155,000 | $190,000 | $62,644 | $407,644 |
| 2015 | $130,667 | $175,000 | $54,589 | $360,256 |

13.     Defendant Nancy M. Schlichting ("Schlichting") is a Walgreens director and has been since October 2006.  Defendant Schlichting is also a member of Walgreens' Audit Committee and has been since at least December 2015.  Defendant Schlichting knowingly, in bad faith, or in conscious disregard for her duties caused or allowed Walgreens to: (i) operate with inadequate internal controls; and (ii) make improper statements in its press releases and public filings concerning the regulatory risks faced by the Company's now-failed merger with Rite Aid.  Walgreens paid defendant Schlichting the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2019 | $120,000 | $199,990 | - | $319,990 |
| 2018 | $120,000 | $199,958 | $89,669 | $409,627 |
| 2017 | $115,000 | $189,988 | $80,660 | $385,648 |
| 2016 | $115,000 | $189,937 | $74,062 | $378,999 |
| 2015 | $95,000 | $175,000 | $66,553 | $336,553 |

14.     Defendant Ginger L. Graham ("Graham") is a Walgreens director and has been since April 2010.  Defendant Graham is also a member of Walgreens' Audit Committee and has

been since at least December 2015.  Defendant Graham knowingly, in bad faith, or in conscious disregard for her duties caused or allowed Walgreens to: (i) operate with inadequate internal controls; and (ii) make improper statements in its press releases and public filings concerning the regulatory risks faced by the Company's now-failed merger with Rite Aid.  Walgreens paid defendant Graham the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2019 | $100,000 | $200,000 | - | $300,000 |
| 2018 | $100,000 | $200,000 | $42,105 | $342,105 |
| 2017 | $95,000 | $190,000 | $34,559 | $319,559 |
| 2016 | $95,000 | $190,000 | $29,342 | $314,342 |
| 2015 | $85,000 | $175,000 | $23,890 | $283,890 |

15.    Defendant David J. Brailer ("Brailer") is a Walgreens director and has been since October 2010.  Defendant Brailer is also a member of Walgreens' Audit Committee and has been since at least December 2015.  Defendant Brailer knowingly, in bad faith, or in conscious disregard for his duties caused or allowed Walgreens to: (i) operate with inadequate internal controls; and (ii) make improper statements in its press releases and public filings concerning the regulatory risks faced by the Company's now-failed merger with Rite Aid.  Walgreens paid defendant Brailer the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2019 | $120,000 | $200,000 | - | $320,000 |
| 2018 | $120,000 | $200,000 | $46,007 | $366,007 |
| 2017 | $115,000 | $190,000 | $35,858 | $340,858 |
| 2016 | $115,000 | $190,000 | $28,537 | $333,537 |
| 2015 | $95,000 | $175,000 | $21,427 | $291,427 |

16.    Defendant Janice M. Babiak ("Babiak") is a Walgreens director and has been since April 2012.  Defendant Babiak is also the Chairman of Walgreens' Audit Committee and has been since at least December 2015.  Defendant Babiak knowingly, in bad faith, or in conscious disregard for her duties caused or allowed Walgreens to: (i) operate with inadequate internal controls; and

(ii) make improper statements in its press releases and public filings concerning the regulatory risks faced by the Company's now-failed merger with Rite Aid.  Walgreens paid defendant Babiak the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2019 | $125,000 | $200,000 | - | $325,000 |
| 2018 | $125,000 | $200,000 | $24,930 | $349,930 |
| 2017 | $120,000 | $190,000 | $18,759 | $328,759 |
| 2016 | $120,000 | $190,000 | $14,437 | $324,437 |
| 2015 | $110,000 | $175,000 | $10,150 | $295,150 |

17.     Defendant Dominic P. Murphy ("Murphy") is a Walgreens director and has been since August 2012.  Defendant Murphy knowingly, in bad faith, or in conscious disregard for his duties caused or allowed Walgreens to: (i) operate with inadequate internal controls; and (ii) make improper statements in its press releases and public filings concerning the regulatory risks faced by the Company's now-failed merger with Rite Aid.  Walgreens paid defendant Murphy the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2019 | $100,000 | $200,000 | - | $300,000 |
| 2018 | $100,000 | $200,000 | $28,953 | $328,953 |
| 2017 | $95,000 | $190,000 | $20,562 | $305,562 |
| 2016 | $95,000 | $190,000 | $14,460 | $299,460 |
| 2015 | $85,000 | $175,000 | $8,708 | $268,708 |

18.     Defendant John A. Lederer ("Lederer") is a Walgreens director and has been since April 2015.  Defendant Lederer knowingly, in bad faith, or in conscious disregard for his duties caused or allowed Walgreens to: (i) operate with inadequate internal controls; and (ii) make improper statements in its press releases and public filings concerning the regulatory risks faced by the Company's now-failed merger with Rite Aid.  Walgreens paid defendant Lederer the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2019 | $100,000 | $200,000 | - | $300,000 |
| 2018 | $100,000 | $200,000 | $14,614 | $314,614 |
| 2017 | $95,000 | $190,000 | $7,371 | $292,371 |
| 2016 | $95,000 | $95,000 | $2,418 | $192,418 |
| 2015 | $33,723 | - | - | $33,723 |

19.     Defendant José E. Almeida ("Almeida") is a Walgreens director and has been since April 2017.  Defendant Almeida knowingly, in bad faith, or in conscious disregard for his duties caused or allowed Walgreens to: (i) operate with inadequate internal controls; and (ii) make improper statements in its press releases and public filings concerning the regulatory risks faced by the Company's now-failed merger with Rite Aid.  Walgreens paid defendant Almeida the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2019 | $100,000 | $199,990 | $299,990 |
| 2018 | $100,000 | $99,979 | $199,979 |
| 2017 | $34,851 | - | $34,851 |

20.     Defendant George R. Fairweather ("Fairweather") was Walgreens' Executive Vice President and Global Chief Financial Officer ("CFO") from February 2015 to June 2018; Principal Accounting Officer from February 2015 to August 2015; and a senior advisor to Walgreens' CEO from June 2018 to at least December 2018.  Defendant Fairweather is named as a defendant in a related securities class action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act.  Defendant Fairweather knowingly, recklessly, or with gross negligence caused or allowed Walgreens to: (i) operate with inadequate internal controls; and (ii) make improper statements in its press releases and public filings concerning the regulatory risks faced by the Company's now-failed merger with Rite Aid.  Walgreens paid defendant Fairweather the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|---------------|----------------------------------------|------------------------|-------|
| 2017 | $886,314 | $2,031,732 | $2,523,924 | $1,555,481 | $399,301 | $7,396,752 |
| 2016 | $977,118 | $1,607,565 | $1,650,466 | $2,011,329 | $424,701 | $6,671,179 |
| 2015 | $687,268 | - | - | $2,051,657 | $309,026 | $3,047,951 |

21.    Defendant Leonard D. Schaeffer ("Schaeffer") was a Walgreens director from May 2015 to September 2019.  Defendant Schaeffer knowingly, in bad faith, or in conscious disregard for his duties caused or allowed Walgreens to: (i) operate with inadequate internal controls; and (ii) make improper statements in its press releases and public filings concerning the regulatory risks faced by the Company's now-failed merger with Rite Aid.  Walgreens paid defendant Schaeffer the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|-------------|-------------------|--------------|------------------------|-------|
| 2019 | $100,000 | $200,000 | - | $300,000 |
| 2018 | $100,000 | $200,000 | $8,922 | $308,922 |
| 2017 | $95,000 | $190,000 | $4,034 | $289,034 |
| 2016 | $95,000 | $79,167 | $1,014 | $175,181 |
| 2015 | $22,174 | - | - | $22,174 |

22.    The defendants identified in ¶¶10-11, 20 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶10-19, 21 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶13-16 are referred to herein as the "Audit Committee Defendants."   Collectively, the defendants identified in ¶¶10-21 are referred to herein as the "Individual Defendants."

**Additional Duties of the Audit Committee Defendants**

23.    In addition to their standard fiduciary duties, under the Audit Committee Charter, the Audit Committee Defendants, defendants Schlichting, Graham, Brailer, and Babiak, owed specific duties to Walgreens to assist the Board in overseeing: (i) "the integrity of the Company's financial statements and its accounting and financial reporting process"; (ii) "the soundness of the

Company's systems of internal accounting and financial controls"; and (iii) "the Company's compliance with legal and regulatory requirements."

24.     With respect to the Audit Committee's oversight of financial statements and public disclosures, the Charter provides that the Audit Committee must review and discuss with management the Company's earnings releases and financial guidance, and prepare a Committee report to be included in the Company's Annual Report.  The Charter further requires the Audit Committee to "review the adequacy and effectiveness of the Company's disclosure controls and procedures," including any deficiencies in those controls.  In particular, the Charter states:

> Review of Earnings Releases. Discuss with management the Company's earnings press releases, including the use of "*pro forma*" or "adjusted" non-GAAP information, as well as financial information and earnings guidance provided to analysts and rating agencies. Such discussion may be general (consisting of discussing the types of information to be disclosed and the types of presentations to be made).

> Report for Inclusion in Proxy Statement. Prepare a report of the Committee to be included in the Company's Annual Report on Form 10-K and proxy statement, as required by the SEC.

> *       *       *

> Disclosure Controls and Procedures and Internal Control Over Financial Reporting. Periodically review the adequacy and effectiveness of the Company's disclosure controls and procedures and the Company's internal controls over financial reporting, including any significant deficiencies or material weaknesses and significant changes in internal controls.

25.     Under its Charter, the Audit Committee is also required to assess and discuss with management the risks facing the Company and the steps taken to control such risk exposures.  In carrying out their oversight duties with respect to Walgreens' legal compliance, the Audit Committee Charter provides the Committee must "discuss any significant legal, compliance, or regulatory matters that may have a material impact on the Company's business" and "review the overall adequacy and effectiveness of the Company's legal and compliance programs."  The Audit

Committee is also required to "review with the Board any issues that arise with respect to … the Company's compliance with legal or regulatory requirements … or the performance of the internal audit function."  In particular, the Charter states:

> Risk Assessment and Risk Management. Regularly review and discuss with management, no less than annually, the Company's enterprise risk assessment and key enterprise risks, including major litigation and financial risks as well as information security and technology risks (including cybersecurity). Periodically review the steps management has taken to monitor and control such risk exposures, including the risk assessment and risk management policies and procedures.

*        *        *

> Legal and Compliance. Periodically meet with the Company's General Counsel and Chief Compliance Officer, or other senior members of the Company's legal and compliance departments, and discuss any significant legal, compliance, or regulatory matters that may have a material impact on the Company's business, financial statements, or compliance policies. At least annually, review the overall adequacy and effectiveness of the Company's legal and compliance programs.

*        *        *

> Complaint Procedures. Establish procedures for the receipt, retention and treatment of complaints regarding accounting, internal accounting controls or auditing matters, as well as for confidential, anonymous submission by Company employees of concerns regarding questionable accounting or auditing matters. Review periodically with management and Internal Audit these procedures and any significant complaints received.

*        *        *

> Committee Reports. The Chair of the Committee shall report to the Board regarding the activities of the Committee at appropriate times and as otherwise requested by the Chairman of the Board. The Committee shall review with the Chairman any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the performance and independence of the Company's independent auditor, or the performance of the internal audit function.

## WALGREENS ANNOUNCES AND ENTHUSIASTICALLY PROMOTES ITS NOW FAILED ACQUISITION OF RITE AID

26.    On October 27, 2015, Walgreens announced an Agreement and Plan of Merger with Rite Aid (the "Original Merger Agreement").  Pursuant to the Original Merger Agreement,

- 12 -

Walgreens would acquire Rite Aid for $9 per share in an all-cash transaction valued at approximately $17.2 billion (the "Original Merger").  The joint press release stated, "[t]he transaction is expected to close in the second half of calendar 2016," after "the expiration or termination of applicable waiting periods under the Hart-Scott-Rodino Antitrust Improvements Act of 1976."

27.     The Hart-Scott-Rodino Antitrust Improvements Act of 1976 requires entities seeking to merger to file a premerger notification report with the FTC Bureau of Competition. Filing the report triggers a thirty-day waiting period during which the FTC reviews the premerger notification report to determine whether the proposed transaction is likely to lead to anticompetitive effects.  Based on that review and before the expiration of the thirty-day waiting period, the FTC will either allow the merger, file to block the merger, or request additional information from the parties (often referred to as a "Second Request").

28.     Although the full extent of the antitrust risk inherent to the merger was only known by Rite Aid and Walgreens, journalists and the media quickly sensed that antitrust regulators would be wary of the proposed transaction, since Walgreens and Rite Aid were two of the three largest drugstore chains in the U.S.  For example, on October 27, 2015, the *Wall Street Journal* published an article titled "Walgreens, Rite Aid Unite to Create Drugstore Giant," observed that, "[t]he deal, which would unite two of the country's three biggest drugstore owners, would be likely to draw scrutiny from antitrust regulators, who could demand divestitures in exchange for their approval." The article further points out that "[b]oth Rite Aid and Walgreens have a major presence in states like California, New York, and Massachusetts," and therefore the merger could reduce competition in these overlapping states.  The *New York Times* also published an article on October 27, 2015, titled "Walgreens to Buy Rite Aid for $9.4 Billion," similarly noted that "the combination may

draw a skeptical eye from government regulators concerned about the retail pharmacy market effectively shrinking to only a few big chains."  Walgreens and Rite Aid, however, would dismiss or otherwise downplay these concerns.

29.    On October 29, 2015, Rite Aid filed a Current Report on Form 8-K with the SEC further commenting on the Original Merger.  The Form 8-K attached a "script" for meetings with Rite Aid associates emphasizing the likelihood of the FTC approving the Original Merger.  In particular, the script assured investors that "[b]oth Rite Aid and Walgreens Boots Alliance have had extensive consultation with anti-trust counsel, and based upon the complementary nature of the market profiles of both companies, and the amount of pharmacy counters in the U.S., we do not believe the combination should cause regulatory concern."  The script further assured that even if there was regulatory concern, the Original Merger Agreement provides that "Walgreens Boots Alliance can divest some stores if needed to obtain FTC approval."  In particular, the Original Merger Agreement provides that Walgreens would divest up to 1,000 stores if required to satisfy regulators.

30.    If the FTC determines a proposed transaction is likely to produce anticompetitive effects, the agency will try to negotiate remedies with entities to eliminate such effects or restore competition.  A common remedy is for the acquiring entity to divest some of the acquired entity's stores to a third party.  The FTC must approve the proposed divestiture remedy, including the number of stores to be divested and the third-party buyer of those stores.

31.    Walgreens' fiduciaries represented that the 1,000 store divestiture cap was more than enough to address potential regulatory concern, as they anticipated the Company would only need to divest 500 stores, or less.  Specifically, during the Credit Suisse Healthcare Conference on November 10, 2015, Alexander Gourlay ("Gourlay"), Walgreens' Co-Chief Operating Officer,

stated that although "1,000 stores may have to be divested," "we believe it's probably about 1/2 that number." Similarly, during the Morgan Stanley Global Consumer and Retail Conference on November 17, 2015, defendant Fairweather stated that Walgreens was "anticipating that store divestitures will be less than 500, although our contract provides for up to 1,000, but we don't anticipate that will be the case."

32.    On December 21, 2015, Rite Aid's board of directors filed a Definitive Proxy Statement on Schedule 14A with the SEC to solicit stockholder approval of the Original Merger Agreement (the "2015 Proxy"), which Walgreens reviewed, edited, and approved prior to its filing. In soliciting stockholder approval of the Original Merger Agreement, the 2015 Proxy emphasized that "the $9.00 all-cash per share merger consideration will provide certainty of value and liquidity to Rite Aid stockholders, enabling them to realize value that had been created at Rite Aid in recent years[.]" The 2015 Proxy also told stockholders that the merger "would be completed successfully[.]" This assurance, the 2015 Proxy stated, was based in part on Walgreens' "level of commitment … to obtaining applicable consents and approvals under antitrust and similar laws and assuming the risks related to certain conditions and requirements that may be imposed by regulators in connection with securing such approvals[.]" Although Rite Aid's stockholders approved the Original Merger Agreement on February 4, 2016, the ongoing regulatory review process ultimately prevented the Original Merger from closing.

33.    On December 10, 2015, the FTC issued a Second Request to Walgreens, signaling that the agency had determined the Original Merger presented competitive concerns warranting an in-depth investigation. The FTC rarely issues Second Requests and once it does, the odds of regulatory clearance are narrowed. In each year from 2008 to 2017, the FTC issued Second Requests in less than 3% of reported transactions. From 2015 to 2017, over 80% of Second

Requests led to antitrust regulators challenging the transaction.  Accordingly, the Second Request meant it was extremely likely the FTC would challenge the merger.

34.　████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████

35.　Although the Second Request indicated that the FTC was concerned about the Original Merger's effects on competition, Walgreens characterized it as a typical part of the agency's review process.  On December 11, 2015, Walgreens and Rite Aid issued a joint press release announcing that, "as expected, the two companies have each a request for additional information ("second request") from the [FTC.]"  Walgreens assured that the FTC's second request was "a standard part of the regulatory process in connection with the FTC's review" and reiterating that "[b]oth companies expect the transaction to close in the second half of calendar 2016."

36.　Defendant Pessina echoed these assurances throughout January 2016.  In particular, during Walgreens' January 7, 2016 earnings conference call, defendant Pessina stated, "I would reiterate that this transaction is progressing as we expected and planned" and the FTC's Second Request was merely a "standard part of the regulatory process."  He also reaffirmed that the number of store divestitures to require FTC approval would be less than 500, stating that the Company's

fiduciaries "don't have any reason to change our view."  Defendant Pessina further assured "[w]e are still confident that this will go through in the terms that we have anticipated."  During his prepared remarks at Walgreens' Annual Meeting of Stockholders on January 27, 2016, defendant Pessina stated that the regulatory review of the Original Merger was "proceeding as we had anticipated and we continue to expect the transaction to complete at some point in the second half of this calendar year."

37.    From January to April 2016, Walgreens and Rite Aid provided documents and data to the FTC.  Starting in late April and continuing throughout August 2016, the FTC began identifying geographic areas of concern regarding Walgreens and Rite Aid's overlapping operations to the Company's counsel.  During this time, the FTC informed Walgreens that the Original Merger will likely have anticompetitive effects in violation of section 7 of the Clayton Act.  In order for the FTC to approve the Original Merger, Walgreens would need to find an acceptable remedy, such as store divestitures, to maintain or restore competition in the markets affected by the merger.  The Company's counsel had extensive discussions with the agency's staff regarding these topics and provided routine updates to Walgreens' management and Board.

38.    ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████

39. 

40.

41.



42.

43.                          , Walgreens' fiduciaries publicly assured stockholders that

the FTC would approve the Original Merger in time and under its proposed terms.  For example,

during the Company's earnings conference call on July 6, 2016, defendant Pessina stated that the "proposed acquisition of Rite Aid is progressing as planned," and that the number of expected store divestitures remained "in the range … that we initially indicated, around 500."

44. ████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████

45. ████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████



46.

47.    On September 8, 2016, Walgreens issued a press release updating the status of the Original Merger.  The press release stated that Walgreens was actively engaged with the FTC and that as a result of "progress of these discussions with the FTC staff" it was "exploring potential divestiture remedies."   The Company, however, minimized the implication that "divestiture remedies" meant that the FTC had expressed concerns about the Original Merger's effects on competition and that its approval was therefore in jeopardy.  In particular, the press release asserted

Walgreens was exploring these remedies "[i]n order to expedite th[e] [the FTC's review] process." The press release went on to state that "the most likely outcome will be that the parties will be required to divest more than the 500 stores previously communicated, but still continues to expect that fewer than 1,000 stores will be required to be divested." It further stated that Walgreens "continues to believe that the acquisition will close in the second half of calendar 2016." The Company thus gave investors confidence that the Original Merger would close within the parameters set forth in the Original Merger Agreement.

48.

49.    [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

## THE INDIVIDUAL DEFENDANTS ISSUE A SERIES OF IMPROPER STATEMENTS CONCERNING THE LIKELIHOOD OF THE RITE AID MERGER

50.    The Individual Defendants were well aware the Rite Aid acquisition was in doubt due to the FTC's concerns and as a result of the delays associated with resolving those concerns. Despite this knowledge, these fiduciaries failed to soften their aggressively confident stance. Instead, from October 20, 2016 to June 28, 2017, the Individual Defendants made a series of improper statements continuing to assure investors they were confident the deal would close while dispelling outside reports signaling regulatory turbulence. The Company's fiduciaries backed these assurances by alluding to inside knowledge of the FTC's review process and noting their close collaboration with the agency. They further asserted their confidence in that the deal closing

had not changed since the beginning ███████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

**Walgreens Touts Confidence in Regulatory Approval as It Extends the Merger's End-Date**

51.    On October 20, 2016, Walgreens and Rite Aid issued a joint press release announcing that they had extended the merger agreement end date under the Original Merger Agreement from October 27, 2016 to January 27, 2017.  The same day, Walgreens issued a press release announcing its financial results for the fourth quarter and fiscal year end of 2016.  The press release stated that Walgreens expected the FTC will require the divestiture of "between 500 and 1,000 stores."

52.    Concurrent with the joint announcement, the Company issued a separate press release on the same day announcing its results for the fourth quarter and fiscal year ended August 31, 2016. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████    The press release stated that the Company's pending acquisition of Rite Aid "*is progressing as planned*."  It further stated that Walgreens "believes it will be able to execute [divestiture agreements] to potential buyers, pending FTC approval, by the end of calendar year 2016, and now expects its acquisition of Rite Aid will close in early calendar 2017."  Walgreens' fiscal year 2017 guidance included in the press release "assumes an accretion of $0.05 to $0.12 from Rite Aid."

────────────────────────

█████████████████████████████████████████████████████████████

██████████████████

53.    ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████

54.    Also on October 20, 2016, the Company held an earnings conference call with analysts and investors to discuss its operating and financial results.  During his opening remarks, defendant Fairweather commented on the Original Merger's recent developments, stating that Walgreens "remain[s] actively engaged with the FTC on its review" and that "the most likely outcome will be that the parties will be required to divest between 500 and 1,000 stores."  He further stated that Walgreens "will be able to execute agreements to divest these stores to potential buyers, pending FTC approval, by the end of calendar year 2016, and now expect[s] to close the acquisition in early calendar year 2017."

55.    During the question and answer portion of the conference call, defendant Pessina reiterated Walgreens' confidence in an early 2017 closing.  In particular, an analyst asked defendant Pessina, "what gives you confidence in an early 2017 close?"  He responded by stressing that Walgreens was "*as confident as [it was] before*" that the deal would close under the terms of the Original Merger Agreement based on the Company's discussions with the FTC's and Walgreens' own internal analyses.  To further support this claimed confidence, defendant Pessina pointed out that Walgreens included Rite Aid accretion from the Original Merger in its fiscal 2017 guidance.  In addition, he claimed that outside news reports of regulatory issues surrounding the

Original Merger were false, alluding to nonpublic "inside" knowledge of the FTC's review. In particular, defendant Pessina stated:

> Rite Aid, yes, I agree with you that it is taking more than we expected. ***But I have to tell you that as you have seen from our presentation and from the fact that we have included some part of our Rite Aid potential profit in our guidance, from this, you can really understand that we are confident, as confident as we were before, about this deal. Nothing has changed***. We have just a delay in the conclusion of the deal. This is our perception, we have always been optimistic because we have never seen an attitude from the FTC which was absolutely negative. Of course, they were inquiring, they were very detailed, they were asking a lot of questions. Sometimes, they were taking time to respond. But at the end of the day, I believe we have had a good collaboration. We are having a good collaboration. We try to respond to all of their needs. This takes time. ***But at the end, we are still confident***. Of course, ***I know that we read on the papers very different news. No idea about the sources of these news. But for sure, if we could talk, and of course, you know that we cannot, our news would be different***. For what we see today, we see just a long administrative process, but ***we don't see substantial differences from work that we were expecting. Yes, probably more stores, a little more stores here and there. But at the end of the day, I – as far as I can see today, as far as we can see today, we are absolutely confident that we can create – that we can do the deal and we can create the value. Just this value will be a little postponed on time*** because if and when we will do the deal, of course, for the first months, we will not be able to start immediately the synergies. It will take some time. And we were hoping to do the deal at the beginning of this fiscal year. For us, in this case, we would have had time to develop some of the synergies. Of course, if we close the deal relatively late in our fiscal year, the synergies will be small, but we will find all of them next year.

56.    The Individual Defendants had no basis to make these assurances.



the Individual Defendants knew it was improbable that the Original Merger would receive regulatory approval by the end of calendar 2016.

57.    On November 8, 2016, the Company participated in the Credit Suisse Healthcare Conference.  During the conference, defendant Pessina continued to express confidence in the deal

closing while rejecting any notion of the Original Merger encountering regulatory turbulence and alluding to inside knowledge of the FTC's review.  Specifically, defendant Pessina stated:

> And if we can add something, everybody we have seen today and in the last days is asking about Rite Aid and about we have a different opinion than certain journalists who are writing things we don't recognize or people we – or about people we have never heard of.
>
> So just to reassure you, if we say that we are confident, it is because what we know makes us very confident. I don't believe that there is any technical reason why this deal should not go through. Of course, everything is possible politically, but until now we have seen a careful, diligent but absolutely not hostile attitude of the FTC, and we are collaborating. We are presenting our buyers, and I believe that so far, so good. And we continue to be very positive in spite of the opinion of certain people, who apparently are not particularly well informed.

58.    On November 15, 2016, the Company presented at the Morgan Stanley Global Consumer and Retail Conference.  In response to a question concerning further updates regarding Rite Aid, Gourlay rejected the notion of regulatory concern and reiterated that Walgreens' confidence in the deal closing was as strong as it was on "day one" when the transaction was announced.  In particular, Gourlay stated:

> No, the process continues. It's – the process has never stopped. It's a process that clearly has taken longer than we had anticipated, we're having to sell potentially a few more pharmacies than we anticipated. We have buyers. I want to say, we have buyers, not a buyer, we have buyers. We believe these buyers – we believe strongly these buyers meet the criteria of the SEC have laid down, and the process continues. And we've given updates saying that we expect to give more information on a deal in the early part of next year, and we stick by that. So we don't recognize what's written in the press, to be honest. We don't recognize the names or the people talking about it, so we don't know where that's being said. We remain, as we did from day one, confident this is a good strategic deal for us. The Rite Aid board clearly believes it's a good deal for them, and we believe we'll get it done.

59.    Gourlay doubled-down on this confidence in response to a question about how Rite Aid fit into Walgreens' strategy, stating that the Company's fiduciaries "believe even more in the Rite Aid deal from that point of view than we believed probably 2 years ago as we've understood the market and these network changes have happened."

60.     Walgreens' executives continued to tout their confidence in the deal closing during the Jefferies Healthcare Conference on November 17, 2016.  During the conference, defendant Fairweather repeated that "nothing really has changed" regarding the Original Merger and emphasized that Walgreens was "very clear" that the deal would pass regulatory review within the divestiture cap.  Specifically, defendant Fairweather stated:

> **We are very clear – from what we said in September, we expect the deal to complete**. We have been absolutely consistent on that from day one when we announced it. As we said back in September and reinforced in our results, we do expect the store divestitures to now be in the range of 500 to 1000.

> We expect to be able to sign the divestiture agreements before the end of this calendar year and to be able to complete the transaction in the first quarter, so it is – sorry, early in the new year, in the calendar year.

> So other than really from where we are a year ago, it is a few more divestitures than we had originally anticipated but within what we had in the contract, and it has just taken us a little bit longer than – ideally we would have hoped to work through with the FTC when we work in a very collaborative manner (inaudible).

> But, fundamentally, the economics of the deal are the same. We still expect to be able to deliver the $1 billion of tangible, measurable cost synergies in a 3- to 4-year period. The benefits are from the front end; all these other things….

61.     Gradwell bolstered defendant Fairweather's assertions by emphasizing that Walgreens had "clarity" on the issue derived from the Company's extensive due diligence, merger-related expertise, and discussions with FTC staff.  In particular, Gradwell stated:

> But I think – **just to be clear on where we are in the process and we have spoken about this – I mean we have enough clarity on what we have to do in terms of remedies with the FTC to be – to have opened the data room for sale of pharmacies to potential buyers**.

> Everyone I know – there was large speculation in the marketplace that we would never find buyers. We are not entirely that green when it comes to doing transactions. We went into this in the knowledge that the Walgreens management team had looked at Rite Aid in many different ways and had not been able to justify the deal for a variety of reasons.

And so we went into it having assessed initially that we would be able to find buyers and that those interested in the marketplace to buy stores we may have to divest. That remains the case. We have been in ongoing discussion with the FTC.

62.

63.

64. 

65.

66.     On December 20, 2016, Walgreens and Rite Aid issued a joint press release announcing they had entered into an agreement with Fred's to sell 865 Rite Aid stores for $950 million in cash in order to complete the Original Merger.  The press release noted that the "agreement is being entered into to respond to concerns identified by the FTC in its review of the

proposed acquisition of Rite Aid by Walgreens."   The press release also emphasized that Walgreens was "actively engaged in discussions with the FTC … and is working toward a close of the Rite Aid acquisition in early calendar 2017," which would have completed the deal within the extended timeframe and divestiture cap under the Original Merger Agreement.   Defendant Pessina commented in the press release explaining that, "[w]ith this agreement, we are moving ahead with important work necessary to obtain approval of our acquisition of Rite Aid."   These comments signaled to the market that regulators were close to approving the Original Merger when in reality they were not.

67.     On January 5, 2017, Walgreens issued a press release announcing its financial results for its first fiscal quarter of 2017.   Defendant Pessina is quoted in the press release stating that Walgreens "raised the lower end of our fiscal year guidance by 5 cents per share," noting that the Company "continue[s] to work toward closing the pending acquisition of the Rite Aid Corporation in the early part of this calendar year." ████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████         ██████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

68.     Also on January 5, 2017, the Company held an earnings conference call with analysts and investors to discuss its financial results for its first fiscal quarter of 2017.   During the call, defendant Fairweather claimed that the Rite Aid transaction was making "good progress towards complet[ion]" and that, as such, "we have raised the lower end of our adjusted earnings per share guidance for fiscal year 2017."   He later added that the Company was "actively engaged in discussions with the FTC, and [is] *still working towards a close of the acquisition in the early*

*part of this calendar year*."  Defendant Fairweather also reaffirmed the 2017 fiscal guidance that included "Rite Aid accretion of $0.05 to $0.12" adjusted diluted net earnings per share for the year.

69.     Defendant Pessina likewise highlighted "the progress … regarding the proposed transaction with Rite Aid" during the call.  He continued by claiming the FTC review process, however slow, allowed him to "*remain as convinced as ever of the strategic benefit of the proposed Rite Aid transaction*."  Defendant Pessina then added that Walgreens was "clearly making progress, and while I would always like to move faster and do more, we must be measured and ensure we work at a pace with which *we are confident we can deliver for our customers and our shareholders, on all the plans and strategies we have discussed with you*."  During the call, an analyst asked whether Walgreens had a "plan B" in the event the Original Merger was not approved.  Defendant Pessina answered by claiming the Company did not have or need a Plan B given its "good relationship" with the FTC staff.  Specifically, defendant Pessina stated:

> [W]e don't want even to think of the fact that the deal could not be approved after so many months, when we have given a lot of information, and *we have had a very good relationship with the people of the FTC. ...  So we are not thinking of a plan B today*.

70.     However, on January 6, 2017—just one day later and based on the same information available to the Individual Defendants at the time of the earnings conference call—Rite Aid's attorneys concluded that "the FTC would not recommend approval of the divestiture transaction by the [January 27, 2017] end date."

**Walgreens Revises the Original Merger Agreement and Extends the End-Date Yet Again While Continuing to Falsely Assure Investors the Deal Would Close**

71.     Members of Rite Aid's and Walgreens' management met on several occasions in January 2017, as it became apparent that the FTC still would not approve the Original Merger by the extended end date.  During these meetings, the companies "discussed the FTC review process and ways in which the parties might propose to revise certain aspects of Fred's business plan and

propose potential changes to the asset purchase agreement to address the questions raised by the

FTC Staff in their review of Fred's and to increase the likelihood of obtaining FTC approval of the

transaction."  On January 23, 2017, Rite Aid's counsel advised Rite Aid that Walgreens "likely

needed to proffer additional divestiture obligations in order to maximize the chance of obtaining

FTC approval of the transaction."[3]

72. ███████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████

---

[3] *See* Rite Aid's Proxy Statement filed with the SEC on March 2, 2017.

73. 

74.     Then, on January 30, 2017, Walgreens and Rite Aid issued a joint press release announcing they had terminated the Original Merger Agreement and entered into a new merger agreement (the "Revised Merger Agreement"). ███████████████████████████ ███████████████████████████  The press release announced that the Revised Merger Agreement called for between 1,000 and 1,200 store divestitures and slashed the per-share consideration from $9 per share to between $6.50 and $7 per share, depending on the number of store divestitures required to satisfy antitrust regulators (the "Revised Merger").  The Revised Merger extended the merger deadline, once again, to July 31, 2017.  As

with the Original Merger, the Company's fiduciaries professed they were confident the FTC would approve the Revised Merger, assurances that likewise lacked a reasonable basis and were subsequently proven to be inaccurate.

75.     On April 5, 2017, Walgreens held an earnings conference call with analysts and investors to discuss the operational and financial results for its second fiscal quarter of 2017. During his opening remarks, defendant Pessina highlighted Walgreens' announcement of a $1 billion share repurchase program that became available as a result of the Revised Merger, which would return value to Walgreens' stockholders "without undermining our intention to [profitably] deleverage the company *following the closing of the proposed Rite Aid acquisition*."  Defendant Pessina noted that although the process for received clearance for the transaction was taking longer than expected, Walgreens was "still optimistic" that the merger would close and that the Company could certify compliance "in the coming weeks."  He concluded his opening remarks with the reassurance that Revised Merger is more likely to satisfy antitrust regulators.   In particular, defendant Pessina stated:

> I am still optimistic that we will bring this deal to a successful conclusion. But there is no doubt that the process of getting clearance for the transaction is taking longer than we expected. We are constantly and currently collaborating with FTC, Rite Aid and Fred's to get the necessary approvals and close the transaction. At the same time, we are working to be in a position to certify compliance. We believe that we can achieve this in the coming weeks and are still working toward our revised time table to obtain a clearance by the end of July. *The changes to the deal that we agreed in January demonstrate our absolute commitment to ensure all transactions meet our demanding financial and strategic requirements while allowing us the ability to address any reasonable demand that may be made of us in obtaining regulatory approval*.

76.     During the question and answer session of the call, an analyst asked defendant Pessina, "where exactly aren't you and the FTC seeing eye to eye?"  He responded by stating, "*I am still positive on this deal.  I believe that we have a strong argument for – to defend this deal*."

Defendant Pessina added that Walgreens was "***collaborating very well with the FTC***" and "***preparing our facts to be ready to certify compliance***."

77.

78.

79.    Defendants Skinner, Pessina, Foote, Schlichting, Graham, Brailer, Babiak, Murphy, Lederer, Almeida, Fairweather, and Schaeffer

. The fact that

Walgreens was still unable to resolve the FTC's questions and concerns about the merger's impact on competition over a year after they were initially raised, contradicts the Individual Defendants' repeated assertions of "confidence" and "clarity" on the issue

## REASONS THE STATEMENTS WERE FALSE AND MISLEADING

80.     The statements referenced above were each improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing:

(a)     the FTC had identified geographic areas of concern where Walgreens' and Rite Aid's businesses overlapped and had informed the Company that the Original Merger was likely to produce anticompetitive effects under section 7 of the Clayton Act;

(b)     as a result of their overlapping businesses, the proposed combination of Walgreens and Rite Aid presented significant regulatory concern and it was unlikely the FTC would approve the Original Merger and later the Revised Merger;

(c)     the planned divestitures did not go far enough to preserve competition and satisfy the FTC's concerns;

(d)     the delayed regulatory review process signaled the FTC was unlikely to approve the Original Merger and later the Revised Merger;

(e)     the inclusion of Rite Aid accretion in Walgreens' fiscal 2017 guidance lacked a reasonable basis; and

(f)     as a result of the foregoing, the Individual Defendants' representations concerning the likelihood of Walgreens' acquisition of Rite Aid and its prospects were improper

## THE COMPANY TERMINATES THE RITE AID MERGER

81.     On June 29, 2017, the Company shocked the market as it announced that it had terminated Revised Merger Agreement and, instead, entered into an Asset Purchase Agreement pursuant to which Walgreens would simply acquire 2,186 stores, three distribution centers, and related inventory from Rite Aid.  As a consequence of terminating the Revised Merger Agreement, Walgreens was forced to pay a $325 million termination fee to Rite Aid.

82.     During the earnings call held the same day, Walgreens' fiduciaries shifted course from their previous "clarity" that the FTC would approve the deal.  For example, an analyst pointed out that "the stores you're trying to buy do still seem to have a decent amount of overlap with existing Walgreens stores," and asked, "[s]hould we assume that the new plan takes into account feedback from the FTC such that you're highly confident in a shorter FTC review for the new asset purchase?  Or could this still be a battle with the FTC even for the new plan?"  Instead of sharing his baseless confidence that the FTC would approve the deal as he did before, Gradwell referred the question to Pagni: "We actually have (indiscernible) our Counsel, internal General Counsel here, who might answer that."  Pagni answered with the caution that the Individual Defendants should have offered while the Original Merger and later the Revised Merger were under regulatory review.  In particular, Pagni stated, "I wouldn't care to express any level of confidence one way or another as to how the transaction will proceed."

83.     During the call, another analyst asked "how the FTC might view" the Asset Purchase Agreement and whether it "perhaps presents a different kind of hindrance?"  Defendant Pessina also referred the question to Pagni, who again responded with appropriate caution.  In particular, Pagni stated:

> Yes, Charles, it's Marco Pagni again. We're not able to comment on how the FTC may or may not see any particular facet of this transaction. But I would say is that it's important that the Rite Aid, going forward, be competitive in the market. And clearly, it's an option to join our procurement vehicle, WBAD, will help it with its

cost of goods going forward, which we believe is important for its competitive position in the market. And I express no view as to how the FTC will see that, but one could imagine that, that might be important for them.

84.     The original terms of the Asset Purchase Agreement would also fall through.  On September 19, 2017, Rite Aid announced that it secured regulatory clearance for an amended and restated asset purchase agreement, pursuant to which Walgreens would purchase only 1,932 Rite Aid stores, three distribution centers, and related inventory for $4.37 billion in cash.

85.     On the news of the Revised Merger's termination, Rite Aid's market capitalization plunged more than 26%, or $1.04 per share on June 29, 2017, to close at $2.89 per share, compared to the previous trading day's closing of $3.93 per share, erasing over $1.09 billion in market capitalization in a single day.  In total, Rite Aid's stock price fell by 66% in just over five months from its January 12, 2017 high of $8.70 per share, to its June 15, 2017 low of $2.95 per share.

86.     In addition to Rite Aid, the Individual Defendants' improper statements also wreaked havoc on Fred's stock price.  As a direct result of these improper statements, the Company now faces two federal securities class action lawsuits brought on behalf Rite Aid's and Fred's investors.

87.     In December 2017, investors who purchased Rite Aid shares at artificially inflated prices filed a federal securities class action lawsuit in the U.S. District Court for the Middle District of Pennsylvania against Walgreens and defendants Pessina and Fairweather, in addition to others (the "*Hering* Action").[4]  The *Hering* Action alleges that Walgreens' executives misrepresented the likelihood the Company's now-failed merger with Rite Aid would secure regulatory approval.  On July 11, 2018, Judge John E. Jones III declined the Company's motion to dismiss, finding that the plaintiff "pled sufficient facts to strongly infer that Walgreens was at least reckless in making

---

[4] *Hering v. Rite Aid Corp.*, Case No. 1:15-cv-2440 (M.D. Pa.)

statements that would mislead a reasonable investor about the level of regulatory risk."  In so doing, Judge Jones noted that Walgreens' statements directly contradicted journalists' reports of "regulatory turbulence" and highlighted its fiduciaries' allusions to having insider information from the FTC "that created a false sense of security."  Judge Jones also found the timing of certain statements suspicious, noting that they were made in close proximity to both the revision of the merger agreement and the ultimate decision to terminate the merger.  On October 24, 2018, Judge Jones granted defendants' motion for judgment on the pleadings based on the plaintiff's standing. Shortly after the *Hering* Action's dismissal, on November 2, 2018, three other Rite Aid investors filed an action based on the specific statements that the court ruled were actionably false and misleading in the *Hering* Action (the "Rite Aid Securities Class Action").[5]  The court again denied the defendants' motion to dismiss the Rite Aid Securities Class Action.  The parties in the Rite Aid Securities Class Action are engaging in discovery.

88.    In June 2019, investors who purchased Fred's shares at artificially inflated prices filed a federal securities class action against Walgreens, Fred's, and defendants Pessina and Fairweather in the U.S. District Court for the Western District of Tennessee (the "Fred's Securities Class Action").[6]  The Fred's Securities Class Action alleges defendants misrepresented the likelihood of the FTC approving Fred's as a divestiture buyer and is based in part on false and misleading statements in the Rite Aid Securities Class Action.  As a result, the Company is now forced to bear the costs of investigating, defending, and potentially settling or paying an adverse judgment for both securities class actions

---

[5] *Chabot v. Walgreens Boots Alliance Inc.*, Case No. 1:18-cv-02118-JEJ (M.D. Pa.).

[6] *Zaller v. Fred's Inc.*, Case No. 2:19-cv-02415-SHL-dkv (W.D. Tenn.).

## DAMAGES TO WALGREENS

89.     As a direct and proximate result of the Individual Defendants' actions, Walgreens has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

        (a)     costs incurred from defending and paying any settlement or adverse judgment in the Rite Aid Securities Class Action;

        (b)     costs incurred from defending and paying any settlement or adverse judgment in the Fred's Securities Class Action; and

        (c)     costs incurred from compensation and benefits paid to the defendants who have breached their duties to Walgreens.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

90.     Plaintiff brings this action derivatively in the right and for the benefit of Walgreens to redress injuries suffered, and to be suffered, by Walgreens as a direct result of legal violations described herein, as well as the aiding and abetting thereof, by the Individual Defendants. Walgreens is named as a nominal defendant solely in a derivative capacity.

91.     Plaintiff will adequately and fairly represent the interests of Walgreens in enforcing and prosecuting its rights.

92.     Plaintiff was a stockholder of Walgreens at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Walgreens stockholder.

93.     The current Board of Walgreens consists of the following twelve individuals: defendants Skinner, Pessina, Foote, Schlichting, Graham, Brailer, Babiak, Murphy, Lederer, and Almeida, and nondefendants Rosalind Brewer ("Brewer") and Valerie Jarrett.  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a

futile, wasteful, and useless act.  Specifically, as set forth below, a majority of the Board either (i)

faces a substantial likelihood of liability or (ii) cannot impartially consider a demand.

**Demand Is Excused Because Defendants Skinner, Pessina, Foote, Schlichting, Graham, Brailer, Babiak, Murphy, Lederer, and Almeida Face a Substantial Likelihood of Liability for Their Misconduct**

94.    As alleged above, defendants Skinner, Pessina, Foote, Schlichting, Graham,

Brailer, Babiak, Murphy, Almeida and Lederer breached their fiduciary duties of loyalty by

making improper statements in the Company's press releases, SEC filings, and during earnings

conference calls regarding the Rite Aid acquisition.  In particular, defendants Skinner, Pessina,

Foote, Schlichting, Graham, Brailer, Babiak, Murphy, Almeida and Lederer misrepresented or

allowed the Company to misrepresent the likelihood of the FTC approving the merger.  They also

overstated the prospects of the Fred's divestiture arrangement and misrepresented their inside

knowledge of the FTC review process.  Defendant Pessina personally made several of the improper

statements detailed above, and defendants Skinner, Pessina, Foote, Schlichting, Graham, Brailer,

Babiak, Murphy, and Lederer ██████████████████████████████████

████████████████████████████    ██████████████████████████

██████████████    As a result, defendants Skinner, Pessina, Foote, Schlichting, Graham, Brailer,

Babiak, Murphy, and Lederer face a substantial likelihood of liability.  Therefore, any demand

upon them is futile.

95.    In addition, the Audit Committee Defendants were also charged with reviewing the

Company's public filings and reviewing and discussing with management the Company's press

releases and earnings guidance.  Thus, the Audit Committee Defendants were responsible for

knowingly or recklessly allowing the improper statements related to the Company's earnings

guidance and financial and disclosure controls.  Moreover, the Audit Committee Defendants

reviewed and approved the improper press releases made to the public.  Despite their knowledge

or reckless disregard, the Audit Committee Defendants caused these improper statements. Accordingly, the Audit Committee Defendants breached their fiduciary duty of loyalty and good faith because they participated in the wrongdoing described herein. Thus, the Audit Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

**Demand Is Excused Because Defendants Cannot Impartially Consider a Demand**

96.     The Board also admits in Company's Proxy Statement filed with the SEC on December 10, 2019 (the "2020 Proxy") that defendant Skinner is not independent. Defendant Skinner has received tens of millions of dollars through his employment with Walgreens, all with the approval of the Board. Accordingly, defendant Skinner lacks independence from defendants Pessina, Foote, Schlichting, Graham, Brailer, Babiak, Murphy, Lederer, and Almeida due to his owingness from receiving such substantial compensation through the years from Walgreens. This lack of independence renders defendant Skinner incapable of impartially considering a demand to commence and vigorously prosecute this action. Walgreens paid defendant Skinner the following compensation:

| Year | Salary | Stock Awards | All Other Compensation | Total |
|------|--------|--------------|------------------------|-------|
| 2019 | - | $9,398,557 | - | $9,398,557 |
| 2018 | - | $6,229,183 | - | $6,229,183 |
| 2017 | - | $7,111,185 | - | $7,111,185 |
| 2016 | - | $6,031,651 | $341,450 | $6,373,101 |
| 2015 | $137,958 | $5,175,015 | $167,454 | $5,480,427 |

97.     The Board also admits that Pessina is not independent in the 2020 Proxy. The principal professional occupation of defendant Pessina is his employment with Walgreens, pursuant to which he has received and continues to receive substantial compensation and other benefits as alleged above. Accordingly, defendant Pessina lacks independence from defendants Skinner, Foote, Schlichting, Graham, Brailer, Babiak, Murphy, Lederer, and Almeida due to his

interest in maintaining his executive position at Walgreens. This lack of independence renders defendant Pessina incapable of impartially considering a demand to commence and vigorously prosecute this action. Walgreens paid defendant Pessina the following compensation:

| Year | Salary | Stock Awards | Option Awards | All Other Compensation | Total |
|------|--------|--------------|---------------|------------------------|-------|
| 2019 | - | $13,158,012 | $5,969,372 | $28,818 | $19,156,202 |
| 2018 | - | $6,229,183 | $7,202,212 | $71,545 | $13,502,940 |
| 2017 | - | $7,111,185 | $7,361,500 | $201,137 | $14,673,822 |
| 2016 | - | $5,017,137 | $4,984,416 | $138,815 | $10,140,368 |
| 2015 | $35,850 | $7,000,006 | - | $97,299 | $7,133,155 |

Accordingly, defendant Pessina is incapable of impartially considering a demand to commence and vigorously prosecute this action because he has an interest in maintaining his principal occupation and the substantial compensation he receives in connection with that occupation. Demand is futile as to defendant Pessina.

98.     Nondefendant Brewer cannot independently consider a demand. The principal professional occupation of Brewer is her employment with Walgreens, pursuant to which she will receive substantial compensation and other benefits, as shown from the amounts defendants Pessina and Skinner have received. Accordingly, nondefendant Brewer lacks independence from defendants Pessina, Skinner, Foote, Schlichting, Graham, Brailer, Babiak, Murphy, Lederer, and Almeida due to her interest in maintaining her executive position at Walgreens. This lack of independence renders nondefendant Brewer incapable of impartially considering a demand to commence and vigorously prosecute this action.

99.     Defendants Murphy and Pessina have a long-standing business relationship, and the two are credited with Walgreens' acquisition of Alliance Boots. Defendant Pessina has history of working with Kohlberg Kravis Roberts & Co., L.P. ("KKR"), a global investment firm that manages multiple alternative asset classes including private equity, energy, infrastructure, real estate and credit, with strategic partners that manage hedge funds. Defendant Murphy was a KKR

partner from 2005 to 2017.  Defendant Pessina's history with KKR dates back to 2007, when AB Acquisition Holdings Limited, a company jointly backed by defendant Pessina and KKR, acquired Alliance Boots.  Defendant Murphy was appointed to Alliance Boots in 2007, while defendant Pessina served as Executive Chairman.  Defendant Murphy worked closely alongside defendant Pessina to effectuate Walgreens' acquisition of Alliance Boots.  Defendant Pessina helped KKR earn $7.3 billion in cash and stock when Alliance Boots sold to Walgreens following a two-step transaction that completed in 2015.

100.    On August 2, 2012, Walgreens acquired 45% of Alliance Boots' outstanding stock for $4.02 billion and approximately 83.4 million shares of Walgreens common stock (the "First Step Transaction").  Alliance Boots was a private company jointly controlled by defendant Pessina and funds advised by KKR.

101.    In connection with the First Step Transaction, Walgreens, KKR and certain of its affiliates, and defendant Pessina and certain of his affiliates (the "SP Investors"), entered into a Shareholders' Agreement.  Under the agreement, the SP Investors are entitled to designate a nominee for election to the Board for so long as the SP Investors meet certain beneficial ownership thresholds and other conditions.  The 2020 Proxy further disclosed that the "SP Investors continue to meet these beneficial ownership thresholds, and [defendant] Pessina is the current designee of the SP Investors."  Defendant Murphy was also appointed to the Company's Board pursuant to a Shareholders' Agreement between Walgreens and KKR, similar to the agreement with the SP Investors.  According to the 2020 Proxy, as of December 10, 2019, defendant Pessina owned 16.5% of the Company's outstanding stock.

102.    Walgreens acquired the remaining 55% interest on December 31, 2014 (the "Second Step Transaction").  Defendants Pessina and Murphy concurrently served as directors of

Sprint Acquisition Holdings Limited (f/k/a AB Acquisition Holding Limited), an entity jointly controlled by defendant Pessina and funds advised by KKR and which sold the remaining 55% interest in Alliance Boots to Walgreens in 2015.  Defendant Pessina, KKR, and defendant Murphy reaped huge proceeds from the completion of the Second Step Transaction.  Defendant Pessina, KKR, and defendant Murphy received approximately $4.9 billion, $3.3 billion, and $7 million worth of cash and stock as a result of the Second Step Transaction, respectively.  Defendant Murphy is also tied to Ornella Barra ("Barra"), the Company's Co-Chief Operating Officer.  Barra and defendant Pessina are partners and share a private residence together.  Barra and defendant Murphy concurrently served as directors of Sprint Acquisition Holdings Limited.

103.    A March 5, 2017 *Financial Times* article notes that the "transaction is credited with boosting KKR's reputation in Europe and establishing [defendant] Murphy's reputation as a skilled private equity practitioner."  In particular, the article states:

> ***Mr. Murphy was instrumental in orchestrating the £12B acquisition of UK pharmacy chain Alliance Boots in 2007***, in what became Europe's largest leveraged buyout, as well as its subsequent merger with US rival Walgreens….
>
> ***The transaction is credited with boosting KKR's reputation in Europe and establishing Mr. Murphy's reputation as a skilled private equity practitioner***….
>
> The debt-laden takeover – just before the financial crisis – saw KKR join forces with Stefano Pessina, then Alliance Boots' executive deputy chairman and largest shareholder, to see off a rival bid led by Guy Hands' Terra Firma.

104.    Defendant Murphy is quoted in a January 24, 2016 *Fortune* article, offering glowing praise of defendant Pessina, stating: "He's got an objectivity which is quite stunning.  He never gets emotionally embroiled; he never loses himself.  He never becomes a slave to the deal."  Further, Walgreens admits in its 2016 and 2017 Proxy Statements that defendant Murphy is not independent.

105.    Defendant Murphy lacks independence from and will not elect to initiate proceedings against defendant Pessina.  As detailed above, defendants Murphy and Pessina have a business relationship dating back to 2007.  The two worked closely with one another to effectuate the Alliance Boots deal.  Defendant Murphy owes his success and reputation to the deal, and thus in part to defendant Pessina.  In connection with the deal, defendants Murphy and Pessina were appointed to the Company's Board, and the two have concurrently served on the Board since 2012, further strengthening their ties.  Due to these ties, defendant Murphy is unable to impartially consider whether to initiate proceedings against defendant Pessina.  Accordingly, demand is futile as to defendant Murphy.

106.    In addition, although defendant Murphy is no longer a partner of KKR, he continues to have business dealings with Walgreens through CVC Capital Partners ("CVC Capital") another investment firm that he became a partner of in approximately August 2019.  CVC Capital owns a significant minority stake in PT Mitra Adiperkasa Tbk ("MAP").  MAP is a major lifestyle retail company in Indonesia.  Shortly after defendant Murphy became a partner of CVC Capital, in November 2019, Walgreens and MAP announced an agreement to form a store development partnership.  The press release states that "[u]nder the terms of the agreement, together the two companies will create a Boots branded pharmacy-led, health and beauty retail business in Indonesia."  Defendant Murphy will not elect to press forward with litigation against the Company's management, including defendant Pessina, due to the risk of CVC Capital being cut out of future favorable deals with Walgreens in retaliation.

107.    Plaintiff has not made any demand on Walgreens stockholders to institute this action since such demand would be a futile and useless act for several reasons.  First, Walgreens is a publicly traded company with approximately 865 million shares of stock outstanding, held by

thousands of individuals and entities spread throughout the country. Second, making demand on such a number of stockholders spread throughout the country would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of such stockholders. And third, making demand on all stockholders would force plaintiff to incur significant expenses, assuming all stockholders could be individually identified.

## TOLLING OF THE STATUTE OF LIMITATIONS

108.    Plaintiff had neither actual nor constructive knowledge of the facts constituting their claims for relief until recently.

109.    Plaintiff did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the claims alleged herein until recently, including, most importantly the requisite *mens rea* of the Individual Defendants for the claims detailed herein.

110.    Upon learning of possible wrongdoing by Company fiduciaries, the plaintiff diligently pursued his right as a stockholder to inspect Walgreens' books and records under 8 *Del. C.* §220. The books and records provided by the inspection demand were necessary and essential to determine if and to what extent wrongdoing actually occurred, including the knowledge of the Individual Defendants wrongdoing.

111.    Upon his discovery of this previously concealed wrongdoing found in the course of his inspection demand pursuant to 8 *Del. C.* §220, plaintiff promptly filed this lawsuit within the statutory period. As a result of Walgreens' active concealment, the running of the statute of limitations has been tolled with respect to any claims that plaintiff has as a result of the unlawful conduct alleged in this complaint.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duty

112.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

113.    The Individual Defendants owed and owe Walgreens fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Walgreens the highest obligation of good faith, fair dealing, loyalty, and due care.

114.    The Individual Defendants violated and breached their fiduciary duties of candor, good faith, and loyalty.

115.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Walgreens has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to the Company.

116.    Plaintiff, on behalf of Walgreens, has no adequate remedy at law.

## COUNT II

### Against the Individual Defendants for Contribution
### Under Section 21D of the Exchange Act

117.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

118.    This claim is brought derivatively on behalf of Walgreens for contribution against the Individual Defendants under the federal securities laws.

119.    Walgreens is named as a defendant in the securities class actions, which assert claims against the Company in violation of section 10(b) of the Exchange Act.  As officers and directors of Walgreens, the Individual Defendants had the power and/or ability to control or

influence the Company's conduct that violated section 10(b) of the Exchange Act and SEC Rule 10b-5.

120.    Walgreens is entitled to contribution from the Individual Defendants in connection with all such claims that have been, are, or may be asserted against Walgreens in the securities class actions.  Therefore, plaintiff, on behalf of Walgreens, seeks contribution from the Individual Defendants, under section 21D of the Exchange Act, 15 U.S.C. §78u-4, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Walgreens, demands judgment as follows:

A.    Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breach of fiduciary duty and violation of securities law;

B.    Directing Walgreens to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Walgreens and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.    a proposal to strengthen the Company's controls over financial reporting;

2.    a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

3.    a provision to permit the stockholders of Walgreens to nominate at least three candidates for election to the Board; and

4.    a proposal to strengthen Walgreens' oversight of its disclosure procedures;

C.    Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Walgreens has an effective remedy;

D.    Awarding to Walgreens restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants,

E.    Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: March 19, 2021

**COOCH AND TAYLOR, P.A.**

/s/*Blake A. Bennett*

Blake A. Bennett (#5133)
The Nemours Building
1007 N. Orange Street, Suite 1120
Wilmington, DE 19801
Telephone: (302) 984-3800
Facsimile:   (302) 984-3939
E-mail: bbennett@coochtaylor.com

OF COUNSEL:

*Attorneys for Plaintiff*

**ROBBINS LLP**
Brian J. Robbins
Stephen J. Oddo
Eric M. Carrino
5040 Shoreham Place
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: brobbins@robbinsllp.com
        soddo@robbinsllp.com
        ecarrino@robbinsllp.com