IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JAMES CLEM, Derivatively on Behalf of WALGREENS BOOTS ALLIANCE, INC.,<br><br>Plaintiff,<br><br>v.<br><br>JAMES A. SKINNER, STEFANO PESSINA, WILLIAM C. FOOTE, NANCY M. SCHLICHTING, GINGER L. GRAHAM, DAVID J. BRAILER, JANICE M. BABIAK, DOMINIC P. MURPHY, JOHN A. LEDERER, JOSÉ E. ALMEIDA, GEORGE R. FAIRWEATHER, and LEONARD D. SCHAEFFER,<br><br>Defendants,<br><br>and<br><br>WALGREENS BOOTS ALLIANCE, INC., a Delaware corporation,<br><br>Nominal Defendant. | C.A. No. 21-406-GBW |

## MEMORANDUM ORDER

Pending before the Court is Plaintiff James Clem's ("Plaintiff" or "Mr. Clem") unopposed Motion for Final Approval of Derivative Settlement, Award of Attorneys' Fees and Expenses, and Service Award ("Motion") (D.I. 51) and corresponding Memorandum of Points and Authorities (D.I. 52). For the following reasons, the Court GRANTS Plaintiff's motion.

### I.  BACKGROUND

On March 19, 2021, Mr. Clem filed this shareholder derivative action alleging that various directors of Walgreens Boots Alliance, Inc. ("Walgreens") made misrepresentations regarding Walgreens' now-failed merger with Rite Aid Corporation ("Rite Aid"). D.I. 2; *see id.* at 2

(alleging, for example: "Despite knowledge that the merger was in jeopardy, the Individual Defendants [*i.e.*, various Walgreens directors or officers] failed to soften their confident stance to investors. From October 20, 2016 to June 28, 2017, these fiduciaries made or allowed Walgreens to make a series of improper statements continuing to assure investors they were confident the deal would close while dispelling outside reports signaling regulatory turbulence.").

On July 9, 2024, the parties entered a settlement that (1) requires Walgreens to implement various corporate governance reforms, (2) provides costs and fees in the amount of $750,000 to Plaintiff's counsel, and (3) provides a service award of $2,500 to Plaintiff. *See* D.I. 52 at 1-2, 13, 20. The corporate governance reforms include: "(i) ensuring annual attendance by directors at the stockholder meeting and at continuing education director training; (ii) enhancing the specific duties of the Audit Committee related to disclosure controls and procedures; (iii) enhancing the oversight responsibilities of the Disclosure Committee when mergers are contemplated; and (iv) enhancing the Company's [*i.e.*, Walgreens'] oversight of whistleblower procedures." D.I. 40 at 1, 12; *see id.* at 4-7 (discussing these reforms in greater detail).

On July 10, 2024, Plaintiff filed an unopposed Motion for Preliminary Approval of Settlement ("Preliminary Approval Motion"). D.I. 39. In support, Plaintiff also filed *inter alia* the Stipulation and Agreement of Settlement (the "Proposed Settlement" or "Settlement") (D.I. 41 Ex. 1), Governance Reforms required by the Proposed Settlement ("Reforms") (D.I. 41 Ex. A), and a Proposed Notice of Pendency and Settlement ("Proposed Notice") (D.I. 41 Ex. B).

On November 19, 2024, the Court held a preliminary approval hearing and, on November 25, 2024, the Court issued a Preliminary Approval Order. D.I. 49. In that Order, the Court *inter alia*: (1) granted preliminary approval of the settlement; (2) scheduled a hearing for final approval on January 23, 2025; (3) required Walgreens to (a) cause notice of the settlement to be published

one time in *Business Wire*, (b) cause notice of the settlement and the terms of the settlement to be posted on the "Investor Relations" page of Walgreens' website, and (c) include the notice and terms of the settlement in a Form 8-K furnished to the SEC; (4) required Defendants' counsel to file with the Court an affidavit or declaration confirming that Walgreens had satisfied the required notices; (5) explained that all Walgreens stockholders would be bound by the settlement; (6) explained the process by which Walgreens stockholders could lodge objections to the proposed settlement; and (7) required Plaintiff to file his motion for final approval by January 9, 2025. D.I. 49 at ¶¶ 2-14.

On December 20, 2024, Defendants' counsel filed a declaration pursuant to the Court's Preliminary Approval Order declaring that Defendant had satisfied the Court's notice requirements. D.I. 50. On December 23, 2024, Plaintiff timely filed his Motion for Final Approval. *See* D.I. 54. On January 13, 2025, Plaintiff also filed a Notice of Non-Objection. D.I. 54. The Notice of Non-Objection states that "the January 9, 2025, deadline to file and serve any objections to the proposed Settlement has passed, and, as of the date of this filing, no objections have been filed, served, or otherwise received by counsel for the Parties." D.I. 54 at 1. Indeed, no objections have been lodged. On January 23, 2025, the Court held a hearing on Plaintiff's Motion for Final Approval.

## II.   DISCUSSION

Rule 23.1(c) of the Federal Rules of Civil Procedure provides: "A derivative action may be settled, voluntarily dismissed, or compromised only with the court's approval." Fed. R. Civ. P. 23.1(c). District courts have "wide discretion" in approving shareholder derivative suits. *See Shlensky v. Dorsey*, 574 F.2d 131, 147 (3d Cir. 1978).

"The principal factor to be considered in determining the fairness of a settlement concluding a shareholders' derivative action is the extent of the benefit to be derived from the proposed settlement by the corporation, the real party in interest." *Shlensky*, 574 F.2d at 147. In addition, district courts approving shareholder derivative settlements consider the factors applicable to approval of class action settlements. *See id.* ("[T]he standards annunciated in *Girsh v. Jepson* for class suit settlements have accordingly been applied, although perhaps with somewhat less rigor, in the settlement of shareholders' derivative suits." (citing 521 F.2d 153, 156-57 (3d Cir. 1975))). The "*Girsh*" factors are:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the shareholders to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the derivative action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement agreement in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Girsh*, 521 F.2d at 156-57. As discussed below, each of the *Girsh* factors weigh in favor of approving the settlement, including the extent of the benefit to be derived from the proposed settlement by Walgreens (which is discussed in the context of *Girsh* factors 8 and 9). Following a discussion of the *Girsh* factors, the Court also holds that Defendants' notice of the proposed settlement to the Walgreens stockholders was sufficient and that the amount of fees, costs and the award is fair and reasonable.

A.   **The First *Girsh* Factor Supports Settlement**

The first *Girsh* factor considers the "probable costs, in both time and money, of continued litigation." *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 814 (3d Cir. 1995). "By measuring the costs of continuing on the adversarial path, a court can

gauge the benefit of settling the claim amicably." *Id.* at 812. "Settlement is favored under this factor if litigation is expected to be complex, expensive and time consuming." *In re Royal Dutch/Shell Transp. Sec. Litig.*, No. 04-cv-374, 2008 WL 9447623, at *17 (D.N.J. Dec. 9, 2008) (internal citations omitted). Derivative actions are, by their very nature, "undeniably complex." *Unite Nat. Retirement Fund v. Watts*, No. 04-cv-3603-DMC, 2005 WL 2877899, at *3 (D.N.J. Oct. 28, 2005). For example, Rule 23.1 imposes a heightened pleading standard and requires Plaintiff to prove that futility was pled with "particularity." *See* Fed. R. Civ. P. 23.1.

Here, Plaintiff states: "Although Plaintiff believes that the claims asserted in the Action have merit and would have litigated the Action vigorously, Plaintiff recognizes the significant risk, expense, and length of continued proceedings necessary to prosecute the Action on behalf of the Company." D.I. 52 at 7. At the hearing on this Motion, Plaintiff further stated that "the complexity and the expense and the duration of the potential litigation weigh in favor of finding that the settlement is fair, reasonable and adequate." Hr. Tr. at 7:8-11; *see id.* at 7:1-8 ("This involved alleged misconduct by the Board of Directors. The case in all likelihood would not see a trial for at least a couple of years, and only after it survived motions to dismiss, merits discovery, expert discovery, motions for summary judgment, and other pretrial motions, including potentially Daubert motions. Not to mention potential post-trial appeals."). Defendants did not disagree with any of these statements. Hr. Tr. at 15:6-8.

For these reasons, the first *Girsh* factor weighs in favor of approving the Settlement.

**B.     The Second *Girsh* Factor Supports Settlement**

"As a general rule, a small number of objectors weighs in favor of approval." *In re Impinj, Inc. Derivative Litig.*, No. 18-cv-1686-RGA, 2021 WL 7209525, at *3 (D. Del. Nov. 22, 2021). Here, no shareholders have objected. *See* D.I. 54 (Notice of Non-Objection); Hr. Tr. at 5:18–6:4

("THE COURT: Okay. And the deadline for filing objections was January 9, 2025. Were any objections filed? MR. ODDO: None that we're aware of, Your Honor. We filed a declaration on January 13th attesting to the fact that we had not received any objections from any stockholder. We were not aware of any that were filed with the Court and we're not aware of any that were sent to defense counsel. And since January 13th, we're unaware of any objections. I don't believe anybody in the court here – there's anybody here today to object, so...."). While the absence of shareholder objections weighs in favor of approving the Settlement, the Court is cautious not to place too much weight on this factor "because the typical investor may not possess the tools with which to value settlement relief comprised entirely of corporate governance reforms." *Impinj*, 2021 WL 7209525, at *3. Thus, the second *Girsh* factor slightly weighs in favor of approving the Settlement.

### C.     The Third *Girsh* Factor Supports Settlement

The third *Girsh* factor considers "the degree of case development" achieved prior to settlement negotiations and seeks to determine "whether [plaintiff's] counsel had an adequate appreciation of the merits of the case" before the derivative claims were settled. *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 813 (3d Cir. 1995). Notably, "[e]ven settlements reached at a very early stage and prior to formal discovery are appropriate where there is no evidence of collusion and the settlement represents substantial concessions by both parties." *Weaver v. Moen*, No. 22-cv-01063-GBW, 2024 U.S. Dist. LEXIS 159346, at *10 (D. Del. Sep. 4, 2024) (quoting *In re Johnson & Johnson Derivative Litig.*, 900 F. Supp. 2d 467, 482 (D.N.J. 2012)). "In some cases, informal discovery will be enough for [plaintiff's] counsel to assess the value of the class' claims and negotiate a settlement that provides fair compensation." *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 436-37 (3d Cir. 2016),

*as amended* May 2, 2016; *see also In re Healthcare Servs. Grp., Inc. Derivative Litig.*, No. 20-cv-03426-WB, 2022 WL 2985634, at *10 (E.D. Pa. July 28, 2022) (holding that "formal proceedings and discovery are not required for plaintiffs to assess the merits of their claims and their likelihood of success").

Here, "despite the absence of formal discovery and extended motion practice," the settling parties "fully appreciate[] the merits of this case." *See Unite Nat. Ret. Fund*, 2005 WL 2877899, at *3. As Plaintiff observes, "Plaintiff's Counsel conducted a thorough investigation of the facts and legal sufficiency of their claims both before and after filing the complaints in the Action." D.I. 52 at 9 (citing Oddo Decl. at ¶ 6).

This investigation included: "(i) reviewing documents produced by the Company in response to Plaintiff's 220 Demand, which included the key Board-level documents regarding the underlying wrongdoing; (ii) reviewing Walgreens' press releases, public statements, SEC filings, and securities analysts reports and advisories about the Company, Rite Aid, and the Rite Aid Merger; (iii) reviewing related media reports about the Company, Rite Aid, and the Rite Aid Merger; (iv) researching applicable law with respect to the claims alleged in the Action and potential defenses thereto; (v) preparing and filing the derivative complaint; and (vi) conducting damages analyses." D.I. 52 at 9 (citing Stip. at ¶ 17; Oddo Decl. at ¶ 6). Following Plaintiff's Counsel's investigation, the Parties reached a settlement through adversarial, arm's-length negotiations between experienced counsel that transpired over several months. *See* D.I. 59 at 9-10; *see also* Hr. Tr. at 11:10-19 ("I can attest, based on personal experience, that this case did not involve any collusion. This was a hard fought case where the settlement negotiations took a long time. The fee negotiations took a long time and there was a lot of back and forth with Mr. Crisp about what exactly was going to be involved in the settlement. Certainly we didn't get everything

we wanted, and I think defendants provided certain things that they didn't want to provide, so there was independent, good-faith negotiations here and absolutely no collusion.").

For the foregoing reasons, the third *Girsh* factor weighs in favor of approving the Settlement.

### D. The Fourth and Fifth *Girsh* Factors Support Settlement; the Sixth *Girsh* Factor is Neutral

The fourth and fifth *Girsh* factors consider the potential risks and rewards of litigating the action "rather than settling it at the current time." *In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 814-16 (3d Cir. 1995); *see In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 537 (3d Cir. 2004). "These factors 'balance the likelihood of success and the potential damage award if the case were taken to trial against the benefits of immediate settlement.'" *Vinh Du v. Blackford*, No. 17-cv-194, 2018 WL 6604484, at *7 (D. Del. Dec. 17, 2018) (quoting *In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions ("Prudential")*, 148 F.3d at 319 (3d Cir. 1998)). Moreover, the fourth and fifth factors "weigh strongly in favor of approval when a plaintiff faces 'significant obstacles' in establishing liability." *Impinj*, 221 WL 7209525, at *4 (quoting *In re Cendant Corp. Litig.*, 264 F.3d 201, 237-38 (3d Cir. 2001)).

Here, Plaintiff asserts: "Plaintiff believes the derivative claims are meritorious but acknowledges that the Action may not have withstood Defendants' anticipated motions to dismiss the Complaint, especially given the heightened pleading requirements under Rule 23.1 and the exculpatory provision in the Company's certificate of incorporation." D.I. 52 at 11. Defendant's anticipated motion to dismiss would have likely regarded, for example, demand futility. Hr. Tr. at 15:21–16:3 ("Candidly, as the motion to dismiss, we would, as Mr. Oddo previewed, had made a Rule 23.1 demand futility argument hinged around what we would have argued to be a majority

of the Board's independence in considering the claims asserted. There are -- you know, just as Mr. Oddo said, there are, you know, some variability and outcomes in those motions, so I can't say for certain that we would have prevailed. I do think we had strong arguments.").

To establish demand futility, Delaware law requires Plaintiff to demonstrate that at least half of Walgreens' twelve-member Board could not have exercised independent and disinterested judgment regarding a demand. *United Food & Com. Workers Union & Participating Food Indus. Emps. Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1059 (Del. 2021) ("If the answer to any of the questions [regarding director independence] is 'yes' for at least half of the members of the demand board, then demand is excused as futile."). Here, while the Complaint alleged that demand would have been futile (*see* D.I. 2 at ¶¶ 90-107), actually establishing that demand would have been futile is a "difficult feat under Delaware law." *In re Chemed Corp., S'holder Derivative Litig.*, No. 13-cv-1854-LPS-CJB, 2019 WL 3215852, at *8 (D. Del. Feb. 26, 2019). Indeed, Defendants here insist that they were disinterested. Hr. Tr. at 15:21–16:3.

In addition, as Plaintiff observes: "Even if either or both stockholders overcame a motion to dismiss, significant risks would remain for the stockholders to improve the result through further litigation, including defeating anticipated motions for summary judgment, proving damages and bad faith on the part of the Individual Defendants, maintaining any favorable judgment through post-trial motions, and surviving any appeals." *See* D.I. 52 at 11; *see id.* (also observing: "Even assuming a liability finding, litigation surrounding the amount of damages would itself consume more time and expense, with no guarantee of success."). Also, as is common in derivative actions, the expected value of judgment at trial here is uncertain and difficult to predict.

For the foregoing reasons, the Court finds that the fourth and fifth *Girsh* factors weigh in favor of approving the Settlement. The sixth *Girsh* factor, however, "is typically used to evaluate

the risk of maintaining class certification in a class action." *Watts*, 2005 WL 2877899, at *4. Because "[a] derivative action does not present the same concern," the sixth factor is neutral. *Id.*

E.   **The Seventh *Girsh* Factor is Neutral**

The seventh *Girsh* factor "addresses whether Defendants could withstand a [monetary] judgment for an amount significantly greater than the [proposed] Settlement." *In re Johnson & Johnson*, 900 F. Supp. 2d at 484 (internal quotations omitted). If defendants could not withstand a monetary judgment for a significantly greater amount, for example, such inability would favor settlement. *Id.* "But even assuming there are sufficient funds to pay a greater judgment, the Third Circuit 'has found that a defendant's ability to pay a larger settlement sum is not particularly damaging to the settlement agreement's fairness as long as the other factors favor settlement.'" *Id.* (citation omitted).

In a derivative suit like this, this factor "is complicated by the fact that the Individual Defendants are entitled to indemnification from the Company." *Impinj*, 2021 WL 7209525, at *4. Indeed, in such circumstances, further litigation could deplete available insurance coverage, at which point "the Company that is supposed to benefit will be spending its own money in providing discovery, indemnifying the Individual Defendants, and funding their own obligations as a Nominal Defendant [here, Walgreens]." *Id.* Also, where a monetary judgment will be paid by an insurance carrier, the Third Circuit has found that a defendant's ability to pay a larger settlement sum is not particularly damaging to the settlement agreement's fairness as long as the other factors favor settlement." *O'Brien v. Brain Research Labs, LLC*, No. 12-cv-204, 2012 WL 3242365, at *19 (D.N.J. Aug. 9, 2012) (citing *Prudential*, 148 F.3d 283, 322 (3d Cir. 1998)).

Here, the parties agree that Walgreens "is a healthy company that faced little to no monetary danger." *Weaver*, 2024 U.S. Dist. LEXIS 159346, at *13; Hr. Tr. at 10:1-6, 15:6-8.

10

Notwithstanding, "the Third Circuit 'has found that a defendant's ability to pay a larger settlement sum is not particularly damaging to the settlement agreement's fairness as long as the other factors favor settlement.'" *See In re Johnson & Johnson*, 900 F. Supp. 2d at 484. Thus, the seventh *Girsh* factor is neutral.

### F.     The Eighth and Ninth *Girsh* Factors Support Settlement

The final two *Girsh* factors consider whether the settlement represents a "good value for a weak case or a poor value for a strong case." *In re Warfarin*, 391 F.3d at 538. These factors ask "'whether the settlement is reasonable in light of the best possible recovery and the risks the parties would face if the case went to trial.'" *Pro v. Hertz Equip. Rental Corp.*, No. 06-cv-3830, 2013 WL 3167736, at *5 (D.N.J. June 20, 2013) (quoting *Prudential*, 148 F.3d at 322).

Here, Plaintiff asserts that "the Reforms are specifically designed to improve Walgreen's internal procedures and oversight controls, are tailored to ensure the alleged misconduct does not recur, and confer benefits upon Walgreens and its stockholders that are immediate, substantial, and long lasting." D.I. 52 at 13. Plaintiff continues: "When compared to the expense and uncertainty of continued litigation, the substantial benefits conferred upon Walgreens support approval of the Settlement." D.I. 52 at 13.

Upon review of the Reforms, the Court agrees. As described above, the Settlement requires Walgreens to implement corporate governance reforms, including "(i) ensuring annual attendance by directors at the stockholder meeting and at continuing education director training; (ii) enhancing the specific duties of the Audit Committee related to disclosure controls and procedures; (iii) enhancing the oversight responsibilities of the Disclosure Committee when mergers are contemplated; and (iv) enhancing the Company's oversight of whistleblower procedures." D.I. 40 at 1, 12; *see also id.* at 4-7 (discussing these reforms in greater detail). These reforms are

11

beneficial, including to the real party in interest (Walgreens), to address the problems disclosed in the Complaint (*e.g.*, improper or insufficient disclosure of information regarding the failed merger with Rite Aid). The Court's holding is also consistent with prior decisions approving settlement requiring corporate reforms. *See Weaver*, 2024 U.S. Dist. LEXIS 159346, at *5-6 (approving Rule 23.1 settlement where the terms involved "reforms to improve Tactile's internal controls regarding its compliance, to directly address the alleged lapses in Board and management-level supervision, and to update Tactile's insider trading policy").

For the foregoing reasons, the eighth and ninth *Girsh* factors weigh in favor of approving the Settlement.

### G. The Notice Given to the Stockholders Regarding the Proposed Settlement Was Sufficient

"Nonparty shareholders must be given notice of a proposed settlement of a shareholder's derivative action." *Bell Atlantic Corp. v. Bolger*, 2 F.3d 1304, 1317 (3d Cir. 1993). "Notice of a proposed settlement, voluntary dismissal, or compromise must be given to shareholders or members in the manner that the court orders." Fed. R. Civ. P. 23.1. "To satisfy due process, the notice 'must be sufficiently informative and give sufficient opportunity for response.'" *Id.* (quoting *Kyriazi v. W. Elec. Co.*, 647 F.2d 388, 395 (3d Cir. 1981)).

Here, the record reveals that Walgreen's stockholders were given sufficient notice, and in a manner consistent with previous court decisions. *See* D.I. 50; *see also, e.g., Weaver*, 2024 U.S. Dist. LEXIS 159346, at *16 (finding nearly identical notice sufficient). Indeed, the "Notice of Pendency and Proposed Settlement of Stockholder Derivative Action (the 'Notice') and the Stipulation and Agreement of Settlement (the 'Settlement Stipulation') were posted on November 29, 2024 to the 'Investor Resources' section of the Company's website, on the 'Shareholder Derivative Settlement Information' page, which was referenced expressly in the Notice." D.I. 50

at ¶ 2; *see id.* (explaining that the Notice and Settlement Stipulation remain there). In addition, the "Notice was published in Business Wire on November 29, 2024." D.I. 50 at ¶ 3. Finally, the "Notice and the Settlement Stipulation were included in a Form 8-K filed by the Company with the SEC, dated November 29, 2024." D.I. 50 at ¶ 4.

For the foregoing reasons, the nonparty shareholders were provided with sufficient notice of the proposed settlement.

### H. The Negotiated Attorneys' Fees, Costs and Service Award Are Fair and Reasonable

"'[A]n award of counsel fees is only justified where the derivative action results in a substantial non-monetary benefit to the corporation.'" *Zucker v. Westinghouse Elec. Corp.*, 265 F.3d 171, 176 (3d Cir. 2001) (quoting *Kaplan v. Rand*, 192 F.3d 60, 69 (2d Cir. 1999)). "In non-fund cases," like this one, "district courts use a lodestar approach to evaluate such an award." *Weaver*, 2024 U.S. Dist. LEXIS 159346, at *16 (citing *In re Schering-Plough Corp. Shareholder Der. Lit.*, No. 01-cv-1412, 2008 WL 185809, at *4 (D.N.J. Jan. 14, 2008) ("The approved settlement does not involve monetary benefits, because the terms only require Schering to implement changes to its corporate governance practices. Thus, the Court must employ the lodestar method to determine the reasonability of the proposed fee award. The lodestar methodology for assessing an award of attorney's fees is well-suited to a shareholders' derivative suit in which the benefit the corporation received from settlement was non-monetary.")).

The lodestar is first determined by calculating "the hours spent by the attorneys on their services and valu[ing] those services by multiplying the hours billed by a reasonable hourly rate." *Silberman v. Bogle*, 683 F.2d 62, 64 (3d Cir. 1982). The lodestar is then modified by two factors: (1) the "contingent nature" of the lawsuit and (2) "the extent, if any, to which the quality of an attorney's work mandates increasing or decreasing the amount to which the court has found the

attorney reasonably entitled." *Id.* If the district court applies a multiplier to the lodestar, it must justify its decision to do so with reference to specific factors. *See In re Schering-Plough*, 2008 WL 185809, at *4 ("For the Court to grant a fee award subject to a lodestar multiplier, it must provide specific justification for doing so, such as the quality of representation, the benefit obtained for the class, the complexity and novelty of the issues presented, and the risks involved." (citing *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir. 2000))).

"The district courts may rely on summaries submitted by the attorneys and need not review actual billing records." *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 306-07 (3rd Cir. 2005); *see also Prudential*, 148 F.3d at 341 (holding that the district court did not abuse its discretion when it "reli[ed] on time summaries, rather than detailed time records").

Here, "Plaintiff's Counsel expended 485.1 hours in connection with the prosecution and resolution of the Action." D.I. 52 at 18 (citing Oddo Decl. at ¶ 30). With "hourly rates that range from $400 to $1,225 for partners to $160 to $560 for associates and professional staff," the lodestar calculation here amounted to "$449,580" with the average rate of $926/hour. D.I. 52 at 18. Compared to the agreed-upon fees of $750,000, and after subtracting the expense of $5,357.52 (*see* D.I. 54 at 18-19), the multiplier is approximately 1.65. This multiplier is appropriate in light of "the quality of representation" that Plaintiff's counsel provided, "the benefit obtained for the class" (*i.e.*, the corporate governance reforms discussed above), and "the complexity . . . of the issues presented." *See In re Schering-Plough*, 2008 WL 185809, at *4.

This multiplier is also consistent with similar decisions. *See, e.g., Prudential*, 148 F.3d at 341 (explaining that lodestar "[m]ultiples ranging from one to four are frequently awarded"); *In re Merck & Co., Inc. Vytorin ERISA Litig.*, No. 08-cv-285-DMC, 2010 WL 547613, at *13 (D.N.J. Feb. 9, 2010) (approving a 2.786 multiplier); *Healthcare Servs.*, 2022 WL 2985634, at *16

14

(approving a multiplier of 2.01 and explaining that "[t]his multiplier is lower than those approved and acknowledged as reasonable within this Circuit and around the country"); *In re AT&T Corp. Sec. Litig.*, 455 F.3d 160, 173 (3d Cir. 2006) ("As a comparison, we approved of a lodestar multiplier of 2.99 in Cendant PRIDES, in a case we stated 'was neither legally nor factually complex.'").

Finally, the Settlement also includes a $2,500 service award to Plaintiff, "paid from the Fee and Expense Amount, in recognition of Plaintiff's role in creating the substantial benefits for Walgreens and its stockholders." *See* D.I. 52 at 20 (citing Oddo Decl. at ¶ 38). "[C]ourts routinely approve incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action [or here, a derivative action] litigation." *Weaver*, 2024 WL 4040355, at *6 (quoting *Dewey v. Volkswagen of Am.*, 728 F. Supp. 2d 546, 577 (D.N.J.2010)).

Here, the time that Plaintiff devoted to this case supports the service award of $2,500 and is within the range that courts have approved as fair and reasonable. *See* D.I. 53 Ex. C at ¶¶ 3, 5 (declaring efforts, including: "I filed the Action after my 220 demand on the Company's board of directors . . . for books and records for my counsel to investigate the alleged wrongdoing cited therein. . . . Over the past few years, among other things, I reviewed the documents filed on my behalf in the Action prior to their filing, and both prior to and since the commencement of the Action, I have regularly consulted with and been updated by my counsel regarding the progress of the case . . . ."); *see also Weaver*, 2024 WL 4040355, at *6 (approving service award of $5,000 and noting that when, like here, "the service award is NOT coming out of the common fund[,] courts commonly award incentive funds around $5,000"). Accordingly, to compensate Plaintiff

15

for his time and effort devoted to this matter, the Court approves the service award to Plaintiff in the amount of $2,500.

* * *

Therefore, at Wilmington this 28th day of January, 2025, **IT IS HEREBY ORDERED** that:

1. The Court **GRANTS** approval of the Settlement;
2. The agreed-to fee Amount of $750,000 is **APPROVED**; and
3. The Service Award to Plaintiff in the amount of $2,500 is **APPROVED**.

                                                                GREGORY B. WILLIAMS
                                                                U.S. DISTRICT JUDGE